IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **VINCENT A. AMBROSETTI**, | Case No. 3:21-cv-00211-IM |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| **OREGON CATHOLIC PRESS AND BERNADETTE FARRELL** , | |
| Defendants. | |

Donald J. Schmid, Law Offices of Donald J. Schmid, 1251 N. Eddy Street, Suite 200, South Bend, IN 46617. Parna A. Mehrbani & Stephanie J. Grant, Tonkon Torp LLP, 1300 SW 5th Avenue, Suite 2400, Portland, OR 97201. Attorneys for Plaintiff.

Michael C. Willes, Willes Law, P.C., 1120 SE Madison Street, Portland, OR 97214. Jeremy Carlton King & Joshua L. Simmons, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022. Miranda D. Means, Kirkland & Ellis LLP, 200 Clarendon Street, Boston, MA 10022. Yungmoon Chang, Kirkland & Ellis LLP, 695 Town Center Drive, Suite 1700, Costa Mesa, CA, 92626. Attorneys for Defendants.

**IMMERGUT, District Judge.**

In this copyright case, Plaintiff Vincent A. Ambrosetti brought a claim against

Defendants Oregon Catholic Press ("OCP") and Bernadette Farrell ("Farrell") for copyright

infringement in violation of the Copyright Act. Complaint for Copyright Infringement

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

("Complaint"), ECF 1 ¶ 1. Plaintiff, a songwriter, alleges that Defendants' song, "Christ Be Our Light," ("CBOL") infringes Plaintiff's copyright in the musical composition known as "Emmanuel." Plaintiff's claim proceeded to a five-day advisory jury trial, and the jury returned a verdict for Defendants on Plaintiff's sole claim. Redacted Jury Verdict Form, ECF 225. In an advisory verdict, the jury found that neither Farrell nor OCP had infringed a valid copyright of Mr. Ambrosetti. Redacted Jury Verdict, ECF 225 at 1–2.

Plaintiff sued Defendants Oregon Catholic Press and Bernadette Farrell under the Copyright Act. This Court granted summary judgment to Defendants, but the Ninth Circuit reversed. *Ambrosetti v. Oregon Cath. Press*, 151 F.4th 1211, 1218 (9th Cir. 2025). This matter was tried to an advisory jury from March 16, 2026, to March 20, 2026. ECF 232–240. The parties filed proposed findings of fact and conclusions of law on May 20, 2026. ECF 241–242.

Having considered the testimony presented at trial, the exhibits admitted into evidence, and the record, this Court hereby enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

Based on these Findings, this Court concludes that Plaintiff has not met his burden to prove copyright infringement by a preponderance of the evidence.[1] Where, as here, there is no direct evidence of copying, a Plaintiff may prove infringement (1) by proving "access" to the plaintiff's work and substantial similarity between the two works or (2) by meeting the higher

---

[1] This Court emphasizes several issues that it does not decide, including whether Ambrosetti had a valid copyright, whether Farrell had access to "Emmanuel" at the time that she created "Christ Be Our Light," and whether "Christ Be Our Light" was an independent creation. Because this Court rules for Defendants on the bases of lack of infringement and equitable estoppel, it need not, and does not, reach these other issues.

PAGE 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

standard of showing "striking similarity" between the two works. Here, "Emmanuel" and "Christ Be Our Light" ("CBOL"), the two works at issue, are not substantially similar. As Defendants observe, the songs' "lyrics, harmonies, choruses, and introductions are objectively dissimilar." Defendants' Proposed Findings of Fact and Conclusions of Law, ("Defs.FF/CL."), ECF 242 at 26; *see id.* 18 (citing Tr.Day.2.AM.313:6.; Tr.Day.2.AM.309:17-22; Tr.Day.2.AM.321:5-8). Under such circumstances, Plaintiff cannot prevail on his copyright claim.

In the alternative, this Court concludes that Defendants have prevailed on their affirmative defense of equitable estoppel. Here, Ambrosetti and Oregon Catholic Press reached a 2017 Settlement Agreement, resolving all claims between the parties. But, Ambrosetti deliberately omitted that he believed he had a claim for copyright infringement against both OCP and Ms. Farrell, a partner of OCP, during settlement discussions. Tr.Day.3.AM.701:10-14. In addition, Ambrosetti used the 2017 settlement both to settle OCP's suit against himself and his companies, and to license works that OCP would not have licensed but for believing it was creating a "blank slate." Tr.Day.2.AM.400:2-9, 403:15-19. Under such circumstances where a false representation induces detrimental reliance, the doctrine of equitable estoppel requires judgment in favor of Defendants.

## FINDINGS OF FACT

### A. VINCENT AMBROSETTI AND "EMMANUEL"

1. Vincent Ambrosetti is an American composer of sacred music. Tr.Day.2.PM.550:1-5. He is also the President of International Liturgy Publications, Inc., ("ILP"), a liturgical music publisher. Tr.Day.3.AM.634:3-7; Ex. 113 at 2.

2. Ambrosetti wrote and first published "Emmanuel" in 1980 as an advent hymn. Tr.Day.2.PM. 551:8-11; 556:5-6. Ambrosetti's company, ILP, publishes "Emmanuel" in

PAGE 3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

the United States, including in hymnals and missals such as the *St. Augustine Hymnal*. Tr.Day.3.AM.707:9-708:10; Exs.109-111.

**B.  BERNADETTE FARRELL & "CHRIST, BE OUR LIGHT"**

3.  Bernadette Farrell is an award-winning English composer of liturgical music, educator, and community organizer who has composed some of the best-known, most-beloved songs for worship in the Catholic church. Tr.Day.3.PM.757:11-13, 761:16-19, 767:12-17; Tr.Day.2.PM.530:19-531:3. She has composed close to 200 works, including "CBOL," which was first published in 1993. Tr.Day.3.PM.759:5-9. Approximately 50 of Farrell's compositions were completed before 1993. *Id.* at 8-9.

4.  Farrell wrote "CBOL" in 1993 for the dedication of St. Gabriel's Church in East London. Tr.Day.3.PM.767:21-768:2, 769:13-15. She was inspired by the church's congregants, many of whom stayed in the church to keep warm because they were experiencing homelessness. Tr.Day.3.PM.769:23-770:13. She was also inspired by conversations with one such woman whom Farrell invited to stay with her in London at the time. *Id.* at. 770:4-13. The song was meant to express the needs and prayers of the congregation and serve as a call to action. *Id.* at.772:19-773:11.

**C.  OCP Publishes "CBOL" and Farrell's Continued Involvement**

5.  Farrell does not reproduce or distribute "CBOL" in the United States herself; she merely receives licensing revenue. Tr.Day.3.PM.795:6-8. Instead, Farrell's music publisher, OCP, has been reproducing and distributing "CBOL" in the United States for over 30 years. Tr.Day.3.PM.762:18-19; Ex. 10.

6.  OCP is a nonprofit publisher of liturgical music for a variety of different Christian worship services. Tr.Day.2.PM. 538:12-17; 526:6-12. OCP primarily publishes hymnals, annual missals, and choral octavos, and provides online resources for musicians including

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

accompaniment books, liturgy planning guides, and recordings. Tr.Day.2.PM.496:24-497:5.

**D. Ambrosetti Has Been Familiar with "CBOL" for Decades**

7.  Since 2009, ILP has licensed works from OCP. Tr.Day.2.PM.539:13-14. Since 2011, ILP specifically licensed and published "CBOL" in its St. Augustine Hymnal, Tr.Day.3.AM.691:25-692:8; Ex. 109, which also includes "Emmanuel." Ex. 109; Tr.Day.3.AM.695:2-22. In the hymnal, Bernadette Farrell is listed as the copyright owner, as well as having written the music and text, for "CBOL." Ex. 109; Tr.Day.3.AM.695:2-17.

8.  Due to ILP's licensing, since at least 2011, Ambrosetti has been aware of "CBOL." Tr.Day.3.AM.724:18-25, 691:25-692:5. Likewise, before 2016, he saw the sheet music for "CBOL." Tr.Day.3.AM.694:9-695:1.

9.  In 2016, Ambrosetti engaged Professor Lawrence Ferrara, a musicologist, to conduct a preliminary report assessing the similarities between "CBOL" and "Emmanuel." Tr.Day.2.PM.560:21-24. Ambrosetti received Ferrara's preliminary report in November 2016, Tr.Day.1.PM.256:9-10, in which Ferrara stated that there was evidence of copying. Tr.Day.2.PM.543:1-4.

**E. Expert Witnesses**

10. Defendants presented expert testimony from Professor Judith Finell, a musicologist and founder of Judith Finell MusicServices Inc. Tr.Day.3.PM.820:12-18. Professor Finell's clients include film, television, and concert classical composers or performers. Tr.Day.3.PM.820:24-821:4. At trial, Professor Finell testified regarding her extensive credentials such as her 30 years of experience as a musicologist, her prior work in music copyright cases including the preparation of over a thousand expert reports for both

PAGE 5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs and Defendants, and her extensive contacts with the media in the area of music plagiarism. Tr.Day.3.PM.820:12-826:15. For example, she was a consultant on musicology for the film, "Sinners," and has served in a similar role for "many shows" including Barney & Friends, Sesame Street, and documentaries for National Geographic. Tr.Day.3.PM.821:15-22. As described below, this Court finds Professor Finell's testimony to be credible.

11. Plaintiff presented expert testimony from Lawrence Ferrara, a musicologist and Professor of Music at New York University. Tr.Day.1.PM.210:18-211:1. For sixteen years, Professor Ferrara served as department chair and director of music and performing arts in the Steinhardt School at New York University. Tr.Day.1.PM.211:2-12. He is a member of the American Musicological Society and the Society for Music Theory. Tr.Day.1.PM.213:5-8.

12. Various portions of Ferrara's testimony lead this Court to question his conclusions. For example, Ferrara's listing of similarities between "Christ Be Our Light" and "Emmanuel" included commonplace elements that he conceded on the stand must be filtered out of the analysis. Ferrara claimed the following as bases for similarity yet admitted they are building blocks to be filtered out: the key of E minor, 3/4 time, verse refrain form, a 16-bar verse, and the use of 4-bar phrases. Tr.Day.2.AM.308:8-309:12, 324:9-15. He also conceded that melodies and pitch sequences found in prior art must be filtered out of the analysis. Tr.Day.2.AM.323:21-324:5.

13. Additionally, in reaching his conclusions regarding the significance of the similarities between the two works, Ferrara double- or even triple-counted the same elements using different terminology, which further calls into question the reliability of his analysis.

PAGE 6 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

14. Ferrara's direct examination also contradicted his expert report on a key issue: the number of pitches from Phrase 1 appearing in prior works. On direct examination, Ferrara testified that he found the first six pitches of "Emmanuel" and "CBOL," 5-1-2-3-2-1, in prior art. Tr.Day.1.PM.256:17-22. On cross-examination, he was confronted with his preliminary report, and testified that he "would not have  . . . submitted as representative of [his] affirmative report," Tr.Day.2.AM.328:3-12, in which he stated that he found the pitch sequence 5-1-2-3-2-1-7-1—the first eight pitches of "Emmanuel" and "CBOL"—in prior art. Tr.Day.2.AM.327:14-18. In fact, he conceded that his report had been "sloppy" on identifying the number of pitches in prior art. Tr.Day.2.AM.327:19-20.

15. Accordingly, this Court finds that the testimony provided by Defendants' expert witness was more persuasive than the testimony provided by Plaintiff's expert witness. This Court accordingly gives more weight to the testimony of Defendants' expert in the findings of fact below.

## F.  Ambrosetti's Testimony

16. Plaintiff himself testified regarding similarities between CBOL and Emmanuel as well as the process by which he created "Emmanuel" in 1980. Tr.Day.2.PM.551:2-11.

17. Independent of any other evidence, Ambrosetti was not credible. His demeanor on the stand was combative, *e.g.,* Tr.Day.3.AM.704:22-705:10, 708:16-709:9; he refused to confirm the order of events for which dates had already been established, Tr.Day.3.AM.698:16–700:9; and he was impeached multiple times by directly contradicting prior testimony—from whether he knew about the deposit copy for "Emmanuel," Tr.Day.3.AM.717:24-718:6, Tr.Day.3.PM.755:24-756:4, to whether he performed "Emmanuel" at a 1988 convention of the National Association of Pastoral

Musicians in Buffalo, New York, Tr.Day.3.AM.682:16-683:18, and to what radio stations may have played "Emmanuel," *id.* at.653:21-656:14.

18. Ambrosetti's testimony also contradicted numerous other witnesses. For example, Ambrosetti claimed to have performed "Emmanuel" in showcases at the 1985 Cincinnati and 1988 Buffalo National Pastoral Musician ("NPM") conventions, but those showcases featured new works, not 8-year-old works like "Emmanuel." Tr.Day.2.AM.372:8-10, 396:4-7.

19. Ambrosetti's testimony conflicted with bedrock musical principles. For example, Ambrosetti made much of his choice to use a D natural instead of a D sharp at the end of Phrase 1, portraying it as a thoughtful compositional choice without which Phrase 2 would have been "predisposed" to being written differently. Tr.Day.3.AM.605:14-23. As Professor Finell testified, however, "[t]here's no D sharp in the key of E minor" and, therefore, "[w]riting a D sharp would actually be, in a sense, breaking a rule." Tr.Day.3.PM.836:8-13.

20. Accordingly, this Court finds that Plaintiff's testimony is less credible than the testimony of Defendants' witnesses. This Court accordingly gives more weight to the testimony of Defendants' witnesses in the findings of fact below.

## G. "Christ Be Our Light" is Dissimilar From "Emmanuel"

21. Despite Ferrara's report's claims of similarity, in the 30 years during which ILP's *St. Augustine Hymnal* was published, no one ever told Ambrosetti that they thought "Emmanuel" and "CBOL" were similar. Tr.Day.3.AM.634:11-21, 696:16-18, 698:6-15.

22. Moreover, the preface to the hymnal thanks ILP's editors for "painstakingly and meticulously scrutiniz[ing] every detail of every musical work." Tr.Day.3.AM.696:2-15;

Ex. 109. Yet none of the editors at ILP ever commented that the two works seemed similar. Tr.Day.3.AM 696:16-18.

23. That is because "Emmanuel" and "CBOL" have significant differences. Thematically, "CBOL" was composed for a unique occasion of the dedication of St. Gabriel's Church in East London for a particular moment in the service when everyone would be in darkness, Tr.Day.3.PM.769:13-770:25. Their lyrics also differ substantially. Tr.Day.2.AM.312:23-313:13.

24. Melodically, their choruses are different. Tr.Day.2.AM.309:17-22. The first four bars of the chorus of "Emmanuel" are a variant of Bars 9 - 12 in the verse, Tr.Day.1.PM.219:3-5, whereas "CBOL"'s last four bars changes key from E minor in the verse to G Major for the chorus. Tr.Day.1.PM.242:8-243:4. The melody in the fourth phrase of each song is also entirely different. Tr.Day.2.AM.309:17-22.

25. Harmonically, the same chords are used in only 2.3 bars of the first 12 bars. Tr.Day.2.AM.321:5-8. The two full bars use the tonic chord (the name of the key), E minor. Tr.Day.2.AM.317:11-16, 318:20-23. As discussed during Defendants' expert Judith Finell's testimony, Tr.Day.3.PM.829:18-830:24,[2] the below demonstrative comparing the harmonies of the two works shows numerous differences:

---

[2] When discussing demonstrative exhibits, this opinion cites to the parts of the trial transcript where the demonstrative was displayed.



26. Structurally, as shown below, "Emmanuel" has an 8-bar introduction that features a melody that does not appear in the verse. Exs. 101 at 3, 226. By contrast, as shown below, the introduction to "CBOL" is the first four measures of the verse. Ex. 102 at 1. Ambrosetti does not accuse the introductions of being similar.

 

Ex. 101 at 3, Ex. 102 at 1 (highlighting added).

27. Despite Plaintiff's arguments to the contrary, Phrases 1-3 of the two songs do not establish that the two songs are similar.

PAGE 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

a. As acknowledged by Plaintiff's expert Ferrara, many of the similarities in Phrases 1-3 must be filtered out of the analysis as they are common building blocks of music. Those include the key of E minor, 3/4 time, verse refrain form, a 16-bar verse, and the use of 4-bar phrases. Tr.Day.2.AM.308:8-309:12, 324:9-15.

b. Ambrosetti focuses on a sequence of 26 pitches and contends that 21 of these pitches are used in common between the two works. Tr.Day.1.PM.226:21-227:3. Yet these pitches are played at different times and for different durations, Tr.Day.1.PM.226:7-9; Tr.Day.3.PM.844:10-12, with different emphases on different pitches, Tr.Day.3.PM.830:25-831:13. The melodies are also different, with "CBOL" rising to a sustained high note in the middle of each phrase, and "Emmanuel" sustaining only lower notes at the end of Phrases 1-2, and at the beginning and end of Phrase 3. Exs. 101, 102.

c. Moreover, different pitches are emphasized in the two songs. In particular, in 3/4 time—the time signature for both works—the first beat of the measure, called the "downbeat," is emphasized. Tr.Day.3.PM.830:25-831:13. "Emmanuel" begins with a "pickup" or "upbeat," meaning the first note of the melody of the verse is sung before the first measure of the verse section formally begins. Tr.Day.1.PM.226:9-16; Tr.Day.3.PM.832:8-16. Thus, the first pitch, or word, is not emphasized—the second one is. Exs. 101, 102, 191. By contrast, "CBOL" does not begin with a "pickup." Tr.Day.1.PM.226:9-16. Nor are the rhythms the same throughout the phrase. Exs. 101, 102. As a result, the pitch sequences between the two songs do not line up when the songs are sung, as demonstrated in bold font in Defendant's exhibit shown at trial:

A **vir**-gin shall **bring** forth a **first**-born **son**.
con-**ceived** by the **Spir**-it of **God**.
**He** shall **save** all his **peo** — ple, and **die**,
our **ran**-som for **sin**.

**Long**-ing for **light**, **we** wait in **dark**-ness.
**Long**-ing for **truth**, **we** turn to **you**.
**Make** us your **own**, **your** holy **peo**-ple,
**light** of the **world** to **see**.

*Ambrosetti v. OCP*
21 Civ. 211 (IM)
**DTX-191**

Ex. 191.

d.  Below, the pitches in Phrase 1 are aligned in each measure vertically based on when they are sung, with the downbeat indicated in bold, as in Ex. 191 above.

"Emmanuel": 5|**1**-2-3|**2**-1-7|**1**- 2|**5**
"CBOL":     **5**-1-2|**3**-    |**2**-1-7|**1**-5

e.  When one compares Phrase 1 of CBOL and Emmanuel, the comparison shows that the two phrases do not emphasize the same pitches and have notably different rhythms. Tr.Day.3.PM.832:8-16. The same is true of Phrases 2 and 3. Exs. 101, 102; Tr.Day.1.PM.231:11-232:6. Phrase 3 has even more dissimilarities, including because bar 9, which appears in this phrase, is totally different between the two works. Tr.Day.2.AM.335:22-25.

f.  Only two pitches in Phrase 3 appear at the same time in the two works as highlighted in yellow below, and as discussed in Finell's testimony at Tr.Day.3.PM.846:17-25. Exs.101, 102. The image below, shown during Finell's testimony, illustrates this contrast.

"Emmanuel":  6-  5|4-3-4|5-  3|5

"CBOL":    3-4-5|6-  |4-3-4|5-3



g.  Moreover, the longest pitch *sequence* in common in Phrase 3 is four notes long: 4-3-4-5, which appears in different bars in the two works. *Id.*

h.  Finally, the contours of the melody in Phrase 3 are also dissimilar. As notated above, "Emmanuel" descends from the highest note (6) of the phrase in bar 9—the beginning of the phrase. "CBOL" ascends to its highest note in bar 10—the middle of the phrase. As a result, these phrases have objectively different contours. Exs.101, 102.

## H.  The 2017 Settlement Between Ambrosetti and Oregon Catholic Press

28.  The parties stipulated that on April 15, 2016, OCP sued Ambrosetti, ILP, and ILP's publishing arm, Lamb Publications, for copyright infringement . Tr.Day.2.AM.358:22-359:4; Tr.Day.3.AM.636:10-16, 698:25-699:10; *see also* Ex. 113. OCP alleged that the defendants' Saint Augustine Hymnal, Second Edition, "contained songs controlled by OCP beyond the terms of the three licenses that the defendants had obtained from OCP." Tr.Day.2.AM.359:1-4.

29.  In 2017, the parties entered into a settlement agreement (the "2017 Agreement"). Ex. 113. As shown below, it contains a provision that releases "any and all claims, demands, actions, causes of action, suits at law or equity…[or] controversies[]" accrued between the parties "from the beginning of time to the Effective Date [February 15, 2017]."

PAGE 13 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

> 2. **Mutual Release.** ==The parties hereto individually and on behalf of their agents, successors, heirs and assigns hereby release and forever discharge each other== and each of their past, present and future parent companies, subsidiaries, affiliates (defined as "any entity that directly or indirectly controls, is controlled by, or is under common control of them"), divisions, partners, real or alleged alter egos, and each of their respective managers, shareholders, directors, officers, employees, agents, representatives, attorneys, accountants, predecessors, insurers, successors, customers, heirs and assigns (collectively, the "Releasees"), ==of and from any and all claims, demands, actions, causes of action, suits at law or equity, debts, sums of money, accounts, controversies, rights, damages, costs, attorneys' fees, losses, expenses, promises or liabilities whatsoever== (including but not limited to antitrust claims), ==known, unknown, asserted or unasserted from the beginning of time to the Effective Date== with the exception of those amounts owed as music royalties pursuant to the OCP-ILP licenses including those noted in paragraphs 3, 4, and 6 herein.

Ex. 113 ¶ 2.

30. The 2017 Agreement also includes a provision that licensed, among other songs, "CBOL" to ILP. Ex. 113 at 4, 6. As shown below, Ambrosetti was a party to this settlement agreement and signed in his personal capacity, as Publisher (and Trustee) for ILP, and as President of Lamb Publishing LLC.

OREGON CATHOLIC PRESS

Dated: February 17, 2017   By: _[signature]_
                           Name: John J. Limb
                           Title: Publisher

INTERNATIONAL LITURGY PUBLICATIONS

Dated: February 17, 2017   By: _[signature]_
                           Name: Vincent A. Ambrosetti
                           Title: Publisher

LAMB PUBLICATIONS LLC

Dated: February 17, 2017   By: _[signature]_
                           Name: Vincent A. Ambrosetti
                           Title: PRESIDENT

VINCENT A. AMBROSETTI

Dated: February 17, 2017   By: _[signature]_

                           Name: Vincent A. Ambrosetti, an individual

PAGE 14 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ex. 113 at 3.

31. During negotiations of the 2017 Agreement, Ambrosetti did not mention to OCP that he believed "CBOL" infringed "Emmanuel." Tr.Day.2.AM.399:11-22. In fact, he repeatedly testified at trial that despite believing there were similarities between the works, he purposefully chose not to share that belief with OCP or Farrell. Tr.Day.3.AM.698:16-24, 701:10-702:9.

32. OCP was unaware that Ambrosetti believed he had a claim for copyright infringement related to "CBOL" prior to signing the 2017 Agreement. *Id*. Instead, it believed that it was creating a blank slate by signing this agreement, Tr.Day.2.AM.400:2-9, and would not have signed the agreement if it had known Ambrosetti intended to reserve his right to bring a lawsuit related to "CBOL." Tr.Day.2.AM.403:15-19.

33. OCP continues to rely on the provisions in the 2017 Agreement today. Tr.Day.2.PM.541:11-13.

**CONCLUSIONS OF LAW**

Based on this Court's factual findings, this Court reaches the following conclusions of law. This Court begins, as it must, by establishing its jurisdiction over this action. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). This Court then addresses the merits of Plaintiff's claim.

**A. Jurisdiction**

1. Plaintiff sued under the copyright laws of the United States. 17 U.S.C. § 101 et seq. This Court has subject-matter jurisdiction over this action because Plaintiff's claim arises under federal law, 28 U.S.C. § 1331. This Court also has jurisdiction under 28 U.S.C. §

1338(a). *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1013 (9th Cir. 1985).

## B. Copyright Infringement

2. "A copyright plaintiff must prove (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work." *Ambrosetti v. Or. Cath. Press*, 151 F.4th 1211, 1218 (9th Cir. 2025) (internal citation and quotation marks omitted).

3. "Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Id.* at 1219 (internal citation omitted).

4. Even without evidence of access, a plaintiff can still prevail through a heightened showing of "'striking similarity' between the two works." *Id. (*quoting *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017)).

5. To show "substantial similarity," courts employ a "two-part test," and both parts must be satisfied for a Plaintiff to meet their burden. *Id.* at 1223; *Skidmore*, 952 F.3d at 1064. Under the objective "extrinsic test," courts "'consider[] whether two works share a similarity of ideas and expression as measured by external, objective criteria.'" *Ambrosetti*, 151 F.4th at 1223 (brackets in original) (quoting *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004)). By contrast, the subjective intrinsic test "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Id.* at 1223–24 (brackets in original) (quoting *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008)).

6. Here, this Court assumes, without deciding, that Ambrosetti owns a valid copyright in the musical composition, known as "Emmanuel," and that Farrell had access to "Emmanuel" when she composed "CBOL."

7. Nevertheless, based on the evidence presented at trial, this Court finds that Plaintiff has not satisfied either the "extrinsic test" or the "intrinsic test" for substantial similarity and therefore, has failed to establish copyright infringement.[3]

### 1. Extrinsic Test

8. Under the extrinsic test, the analysis is objective and "requires breaking the works down into their constituent elements, and comparing those elements for proof of copying as measured by 'substantial similarity.'" *Id.* (internal citation and quotation marks omitted); *see also Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018) (describing the extrinsic test as an "objective" one). "This test often requires analytical dissection of a work and expert testimony." *Ambrosetti*, 151 F.4th at 1223 (internal citation and quotation marks omitted).

9. The Ninth Circuit "require[s] parties to present expert testimony in musical infringement cases." *Williams*, 895 F.3d at 1137. This is because, in "the field of popular songs, many, if not most, compositions bear some similarity to prior songs." *Skidmore*, 952 F.3d at 1069 (quoting 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.05[B] (2017)). Copyright protection thus does not "extend to common or trite musical elements, or commonplace elements that are firmly rooted in the genre's tradition. These building

---

[3] Plaintiff did not present direct evidence of copying at trial. Accordingly, where, as here, the Plaintiff fails to meet his burden to establish substantial similarity, he also cannot establish infringement.

PAGE 17 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

blocks belong in the public domain and cannot be exclusively appropriated by any particular author." *Id*. (internal citations and quotation marks omitted).

10. Under the extrinsic test, the two songs differ substantially. The lyrics, harmonies, choruses, introductions, and fourth phrases of the verses are different. Findings of Fact No. 21–27. "CBOL" modulates to G major for the chorus, whereas "Emmanuel" remains in E minor throughout. Tr.Day.1.PM.242:8-16. This material is qualitatively important because lyrics are an important element of a song, Tr.Day.2.AM.310:9-10, 315:17–25; because melody is fundamentally inseparable from harmony, Tr.Day.2.AM.315:17–25; and because the chorus, the "refrain," is the critical "center" of a song. Tr.Day.3.PM.818:2-6. Rhythm is also critical, as it is a key part of melody, and two songs with identical pitch sequences can still constitute very different songs because of it. Tr.Day.3.PM.847:23-848:18.

11. In addition, as noted previously, this Court finds that the testimony of Defendants' expert, Judith Finell, is substantially more persuasive and credible than the testimony of Plaintiff's expert, Lawrence Ferrara, or the testimony from Plaintiff himself. Findings of Fact No. 10–20. Relying on Finell's expert testimony regarding the differences between CBOL and Emmanuel, this Court concludes that Plaintiff has not shown, by a preponderance of the evidence, that CBOL and Emmanuel are substantially similar under the extrinsic test.

### 2. Intrinsic Test

12. Under the intrinsic test, the songs lack "similarity of expression" when evaluating "from the standpoint of the ordinary reasonable observer, with no expert assistance." *Ambrosetti*, 151 F.4th at 1223–24 (quoting *Jada Toys*, 518 F.3d at 637). This "requires a more holistic, subjective comparison of the works to determine whether they are

PAGE 18 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

substantially similar in 'total concept and feel.'" *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1066 (9th Cir. 2020) (internal citation omitted).

13. First, the songs have different lyrics, which convey entirely different messages. *Compare* Ex. 101, *with* Ex. 102. "Emmanuel" tells the story of the nativity through narrative in the verses. Exs.101, 226. By contrast, the verse of "CBOL" has lyrics that express a need in the first two phrases, followed by a request (or a challenge) in phrases three and four, Tr.Day.3.PM.773:12-20, followed by the chorus, which expresses the religious message of the hymn—"Christ, Be Our Light." Exs.102, 201. "CBOL" also employs a technique called "word painting[]" in which the pitches symbolize the text, such as the melody ascending to the word "light" and descending to the word "darkness" in phrase one, as shown in the below demonstrative exhibit shown at trial during Finell's testimony. Tr.Day.3.PM.833:6-24.



14. The songs also begin with different instrumental introductions, Findings of Fact No. 26, and have different chord progressions, which provide a different context for the melody. Findings of Fact No. 25; *see also* Tr.Day.2.AM.315:17-25.

PAGE 19 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

15. Moreover, the rhythms create a wholly different feel in the verses. In "Emmanuel," the pickup and number of short notes give a sense of driving towards the final words of the phrases: "**first**-born **son**" in Phrase 1, "**God**" in Phrase 2, and "**peo**-ple" in Phrase 3. Ex. 191. By contrast, as shown below by the following demonstrative shown during Professor Finell's testimony, "CBOL" breaks the phrases up by stressing the word placed at the middle and end of each phrase: "**light**" and "**dark**-ness" for Phrase 1, "**truth**" and "**you**" in Phrase 2, and "own" and "**peo**-ple" in Phrase 3. *Id.*; Tr.Day.3.PM.830:25-831:13.



16. As a result, "Emmanuel" embodies a concept of continuous motion to the end of each phrase, whereas the rhythmic concept behind "CBOL" is two arrival points per phrase: once in the middle of the phrase and another at the end. Exs. 101, 102, 191.

17. What's more, regarding Phase 3, the two works have different melodic contours—meaning the general shape of when and by how much the pitches rise and fall. As shown above, Phrases 1-3 of "CBOL" ascend to the highest note in the middle of the phrase, which is sustained, then descend again. Exs. 102, 201. "Emmanuel" does not sustain the highest note of Phrases 1-2, placing the longest notes at the ends of the phrases on lower pitches, such as on the word "God" in bars 7-8. Exs. 101, 226. Phrase 3 of "Emmanuel" begins with the highest note. Exs. 101, 102.

PAGE 20 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

18. Different pitches fall on the downbeats of the two works, emphasizing different pitches. Ex. 191; Tr.Day.3.PM.830:25-831:7; Exs.101, 102. Because of the importance of stressed versus unstressed notes in music, this causes the melodies to sound less similar than they appear when transcribed as a pitch sequence. Tr.Day.3.PM.846:13-14.

19. Finally, the modulation in the chorus of "CBOL"—the "center" of the song—creates an "arrival point" not present in "Emmanuel." Tr.Day.3.PM.818:2-6.

20. Therefore, this Court concludes that the two songs are not "substantially similar in 'total concept and feel.'" *Rentmeester*, 883 F.3d at 1118 (internal citation omitted).

21. The jury returned an advisory verdict in favor of Farrell and Oregon Catholic Press. When a claim is submitted to an advisory jury, "the court is free to accept or reject the jury's advisory verdict in making its own findings." *Harris v. Sec'y. U.S. Dep't of Army*, 119 F.3d 1313, 1320 (8th Cir. 1997); *see also Ashland v. Ling–Temco–Vought, Inc.*, 711 F.2d 1431, 1438 (9th Cir. 1983) (treating findings of the court, when tried with an advisory jury, "as if there had been no verdict from an advisory jury"). While this Court has conducted its own analysis, this Court notes that the jury's advisory verdict also supports this Court's conclusion that Plaintiff has failed to prove, by a preponderance of the evidence, his claim for copyright infringement.

### 3. Plaintiff's Counterarguments Rooted in Phrases 1-3 Do Not Establish Substantial Similarity.

22. Ambrosetti contends that the similarities among Phrases 1-3 suffice to establish substantial similarity. Plaintiff's Proposed Findings of Fact and Conclusions of Law, ("Pl.FF/CL"), ECF 241 at 5 ("What is at issue between the two songs for copyright infringement purposes are bars . . . 1 through 12 of the two works . . . ."). This Court disagrees. To start, Ambrosetti's argument conflicts with Ninth Circuit precedent that the

similarity analysis "requires a more holistic, subjective comparison of the works to determine whether they are substantially similar in total concept and feel." *Rentmeester,* 883 F.3d at 1118 (internal citation and quotation marks omitted).

23. But, even taking Ambrosetti's argument about Phrases 1-3 on its own terms, Ambrosetti has failed to establish that Phrases 1-3 are substantially similar. Findings of Fact No. 27(a)–(h). Phrases 1-3 of "Emmanuel" and "CBOL" differ in their different times and durations, their melodies, their rhythms, pitches, pitch sequences, and contours. *See id.*

24. Accordingly, even accounting for Phrases 1-3, this Court concludes Plaintiff has not met his burden to show, by a preponderance of the evidence, that "Emmanuel" and "CBOL" are substantially similar under either the extrinsic or intrinsic tests. For the same reasons, Plaintiff has also not met his burden to provide a heightened showing of striking similarity. In the absence of the necessary showing of either substantial or striking similarity, this Court concludes that Plaintiff cannot prevail on his infringement claim against OCP or Farrell.

## C. Equitable Estoppel

25. To establish equitable estoppel, Defendants must prove each of the following elements by a preponderance of the evidence: (1) that Plaintiff knew the facts of Defendants' infringing conduct; (2) that Plaintiff's false statement or misleading conduct (either action or inaction) caused Defendants to believe that Plaintiff would not pursue a claim for copyright infringement against them; (3) that Plaintiff intended for Defendants to act on his statement or conduct, or Defendants had a right to believe Plaintiff so intended; (4) that Defendants reasonably believed that Plaintiff would not pursue a claim for copyright infringement against them; and (5) that Defendants were injured as a result of their

reliance on Plaintiff's statement or conduct. *See Day v. Advanced M & D Sales, Inc.*, 336 Or. 511, 518–19 (2004) (en banc); *see also DayBreak Game Co. LLC v. Takahashi*, 2025 WL 2691161, at \*9–10 (S.D. Cal. Sept. 2025); *Kramer v. From the Heart Prods., Inc.*, 300 Fed. App'x 555, 556–57 (9th Cir. 2008) (unpublished).

26. This Court concludes that Defendants have prevailed on each of the elements above by a preponderance of the evidence. As to the first element, Ambrosetti knew about the alleged similarities between "Emmanuel" and "CBOL" as well as his potential claim against OCP when negotiating the 2017 Agreement. Findings of Fact No. 31–33. Ambrosetti obtained Ferrara's preliminary report regarding "CBOL" months before signing the 2017 Agreement. *Id.* Ambrosetti was also likely aware of the allegedly infringing conduct as early as 2011, when he began licensing "CBOL." Findings of Fact No. 8.

27. As to the second element, Plaintiff falsely represented that he did not intend to sue. Estoppel arises where a plaintiff makes a false representation, but "[s]ilence may satisfy the false-representation element" "if a party is silent when it has a 'duty to speak.'" *Nelson v. Liberty Ins. Corp.*, 314 Or. App. 350, 359–60, 362 (Or. Ct. App. 2021) (citations omitted).[4] This duty arises when the party "knows or should know that the failure to speak will likely mislead the other party to act to his or her detriment." *Id.* at 360 (internal citation and quotations omitted).

---

[4] Defendants also allege that Plaintiff made an affirmative false representation since Plaintiff affirmatively represented that all "controversies…known, unknown, asserted or unasserted" were waived between the parties through the Effective Date. Defs.FF/CL. at 27. Because this Court concludes that Plaintiff violated his duty to speak through his silence, it need not, and does not, reach this independent line of argument.

28. When negotiating the 2017 Agreement, Ambrosetti was silent as to any belief of copyright infringement regarding "CBOL," despite having commissioned and received Ferrara's report, and despite the fact that the 2017 Agreement included a license to "CBOL." Findings of Fact No. 9, 30. The negotiation context created a duty for Ambrosetti to tell OCP of his potential claim, because he knew or should have known that OCP would be misled into negotiating to its detriment in the absence of such information.

29. Plaintiff erroneously relies on *Nelson v. Liberty Ins. Corp.*, 314 Or. App. 350 (2021), to argue that he lacked a duty to speak here and thus, he was not equitably estopped from pursuing his copyright claim. . In *Nelson*, Plaintiffs' property was damaged by a fire at a "nearby lumber mill." *Id.* at 352. Plaintiffs sued their homeowner's insurer as well as the owner of the lumber mill. *Id.* After Plaintiffs settled with the lumber mill, the insurance company asserted an affirmative defense based on Plaintiffs' "interference with Defendant's subrogation rights." *Id.* Subrogation is an equitable doctrine that "[i]n the insurance context, . . . permits an insurer in certain instances to recover what it has paid to its insured by, in effect, standing in the shoes of the insured and pursuing a claim against the wrongdoer." *Id.* at 358–59 (internal citations and quotation marks omitted). Critically, when the insured settles with the tortfeasor, the insurer's subrogation rights are extinguished. *Nelson*, 314 Or. App. at 359. Because Plaintiffs had interfered with its subrogation rights, the insurance company Defendant contended that it had an affirmative defense to Plaintiffs' claims. *Id.* at 352.

30. In response, Plaintiffs argued that Defendant was estopped from raising a subrogation-based affirmative defense. The trial court agreed and granted summary judgment to

Plaintiffs on the subrogation-based affirmative defense, reasoning that Defendant "sat back and watched [the settlement] happen" and that Plaintiffs were 'ignorant' of defendant's intention to assert its subrogation rights." *Id.* at 360 (brackets in original). The Oregon Court of Appeals reversed the grant of summary judgment, reasoning that "[a]n objectively reasonable juror could find that defendant did not have a duty to speak" because the insurance company defendant had told Plaintiffs of the "subrogation condition" and could "reasonably expect plaintiffs to take defendant's subrogation rights into account in any settlement negotiations with" the lumber mill defendant. *Id.* at 360.

31. Here, the instant case differs from *Nelson* both procedurally and factually. Procedurally, this Court is deciding the merits so the legally relevant question is this Court's finding of fact by a preponderance of the evidence, not, as in *Nelson*, what an "objectively reasonable juror" could find. Factually, Ambrosetti was silent as to his copyright infringement, which differs from *Nelson* where the insurance company Defendant affirmatively told Plaintiff of their subrogation rights. Findings of Fact No. 31–33. So, *Nelson* does not stand in the way of Defendants making the necessary showing of a false representation.

32. As to the third element, Ambrosetti intended for OCP to rely on his representations in the 2017 Agreement. A plaintiff may not intentionally use his silence to induce a potential defendant to rely thereon. *Eight Mile Style, LLC v. Spotify USA Inc.*, 745 F. Supp. 3d 632, 668 (M.D. Tenn. 2024). Estoppel applies where a rightsholder allows a defendant "to keep infringing, over and over, in a way that would make no sense other than as a business strategy." *Id.*

PAGE 25 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

33. Here, by representing through this mutual release provision that he would not sue OCP, Ambrosetti was able to extract certain concessions that OCP would not have agreed to but for its reliance on Ambrosetti's representations. Findings of Fact No. 32. Specifically, OCP dismissed its copyright infringement suit against Ambrosetti and his companies. As shown below, Ambrosetti's company ILP also obtained a license to publish songs from OCP's catalogue, including "CBOL." *Id.*

**Exhibit A**

| | Song title (composer) |
|---|---|
| 1 | A Voice Cries Out (Joncas) |
| 2 | Abba, Father (Landry) |
| 3 | Age to Age (Vogt) |
| 4 | All That Is Hidden (Farrell) |
| 5 | As I Have Done for You (Schutte) |
| 6 | Be Not Afraid (Dufford) |
| 7 | Blest Be the Lord (Schutte) |
| 8 | Bright As the Sun (Glen) – text only |
| 9 | Center of My Life (Inwood) – music & refrain text |
| 10 | Christ, Be Our Light (Farrell) |

Ex. 113.at.7.

34. As to the fourth element, OCP did not know Ambrosetti intended to reserve the right to sue. A defendant's ignorance of a plaintiff's infringement claim, especially where there was an opportunity to express such a claim during negotiations and the plaintiff does not, warrants estoppel. *See Interscope Records v. Time Warner, Inc.*, No. CV 10–1662 SVW (PJWx), 2010 WL 11505708, at *11 (C.D. Cal. June 28, 2010) (finding Defendants' lack of knowledge of the true facts can "reasonably be inferred" from the fact that Plaintiffs never objected to Defendants' use of the music that Plaintiffs believed to be infringing for six years).

35. As to the fifth element, Defendants have met their burden to prove detrimental reliance. Courts in the Ninth Circuit routinely hold that entering into a settlement agreement that a defendant otherwise would not have entered constitutes detrimental reliance. *See, e.g.*, *Expedite It AOG, LLC v. Clay Smith Eng'g, Inc.*, No. SACV 10-1055 AG (MLGx), 2011 WL 13225044, at *4 (C.D. Cal. July 25, 2011) (finding detrimental reliance for equitable estoppel defense where, if they had known the true facts, party "would have rejected the proposal and would not have continued settlement negotiations.").

36. OCP believed it was negotiating a blank slate between the parties. Findings of Fact No. 32. It would not have entered into the 2017 Agreement but for Ambrosetti's representations. *Id.* In particular, it would not have licensed the right to distribute "CBOL" to Ambrosetti and his company. *Id.* at 30–32. This alone constitutes detrimental reliance. *See Expedite It AOG, LLC*, 2011 WL 13225044, at *4.

37. Finally, shifting gears, Plaintiff contends that even if the settlement and licensing agreement prevents him from suing OCP, it does not provide Farrell with an affirmative defense. Plaintiff's argument lacks merit. To start, Plaintiff has failed to present any evidence of Farrell's independent infringing use of CBOL within the statute of limitations. Rather, Plaintiff only points to OCP's use of "CBOL" within that time period. Tr.Day.3.PM.795:6-8. So, Farrell is only liable if she authorized an act of infringement by OCP. This Court's finding of estoppel precludes that route to liability, however, because it prevents Plaintiff from claiming that OCP committed an act of infringement. And, absent OCP's commission of an act of infringement, Farrell is necessarily not liable for authorizing such an act. *See Danjaq, S.A. v. MGM/UA Commc'ns., Co.*, 773 F. Supp.

PAGE 27 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

194, 202 (C.D. Cal. 1991) (explaining that "no liability can arise under the Copyright Act from the authorization of a noninfringing use of a copyrighted work.").[5]

38. Accordingly, this Court concludes that Defendants have shown by a preponderance of the evidence that Ambrosetti is equitably estopped from asserting his copyright infringement claim against either OCP or Farrell.

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, this Court concludes that Plaintiff has not succeeded on the merits of his infringement claims against Defendants. In the alternative, Defendants have prevailed on their affirmative defense of equitable estoppel, requiring judgment in their favor.

**IT IS SO ORDERED.**

DATED this 28th day of July, 2026.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

---

[5] While Farrell continued to receive licensing revenue from OCP, "profiting alone is insufficient evidence of copyright infringement." *See, e.g., Ledesma v. Del Records, Inc.*, No. 15 Civ. 4266, 2015 WL 8023002, at *2 (C.D. Cal. Dec. 4, 2015) (citing *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173–75 (9th Cir. 2007), *overruled on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010)). To be sure, profiting from direct infringement can suffice for vicarious copyright liability if the one profiting from such direct infringement declines "to exercise a right to stop or limit" the infringement. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). But, Ambrosetti has never alleged secondary liability and such a theory, in any event, would be precluded by this Court's Pretrial Conference Order. Pretrial Conference Order, ECF 216, at 4 (granting motion in limine "to exclude evidence, testimony, or argument concerning secondary liability because neither contributory nor vicarious infringement was pleaded in the Complaint"). Accordingly, any theories of secondary liability are not properly before this Court.